IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

OSCAR SANTIAGO,

                Plaintiff,                Case No. 3:10 CV 173

  -vs-

                                            <u>MEMORANDUM   OPINION</u>

KURT RINGLE, et al.,

                Defendant.

KATZ, J.

This case involves Plaintiff Oscar Santiago's claims filed pursuant to 42 U.S.C. § 1983 for violation of his Constitutional rights under the Eighth and Fourteenth Amendments.   Defendants filed a motion for summary judgement, and Plaintiff filed an "Affirmation in Opposition," which this Court construes as an opposition to Defendants' motion. The matter is currently before the Court pursuant to Plaintiff's objections to Magistrate Judge Vernelis K. Armstrong's Report and Recommendation ("R & R"), which recommends that this Court grant Defendants' motion for summary judgment.

In accordance with *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) and *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981), this Court has made a *de novo* determination of the Magistrate's findings to which Plaintiff objects.  For the reasons stated herein, this Court declines to adopt the Magistrate's R & R, and Defendants' motion for summary judgement is hereby denied.[1]

---

[1] The Court notes that Plaintiff's "Affirmation in Opposition to Defendants' Motion for Summary Judgment" contains allegations of discovery abuse on the part of Defendants.  Given the Court's disposition of the instant motion, it is not necessary to address those issues here.  Any outstanding discovery issues will be addressed in a future status conference with the parties.

**I. Background**

Plaintiff Oscar Santiago is currently incarcerated at the Marion Correctional Institute ("MCI") in Marion County, Ohio. At all times relevant, Defendant Dr. Kurt Ringle was employed by the Ohio Department of Rehabilitation and Correction ("ODRC") and served as MCI's Medical Director, and Defendant Dr. Constance Mosher was employed by the ODRC and served as MCI's Assistant Medical Director. Both Defendants are sued in their individual capacities only.[2]

The facts at issue ultimately revolve around three prescriptions ordered by an outside dermatologist at a February 20, 2008 dermatology consult. Because determination of Defendants' motion requires an understanding of Plaintiff's medical care in its entirety, the chronological progression of Plaintiff's treatment is set for below.

On January 31, 2008, Dr. Mosher treated Plaintiff at the MCI Medical Department for complaints of severe pain, swelling and a rash on both of his lower extremities. Plaintiff's chart reflects he complained of the following symptoms: "Bilateral leg pain, knee pain, ankle pain onset approx. 2 wks ago. Progressively worse over last 3-days. Unable to walk to infirmary or climb into top bunk. 'Feels like hot razors over Achilles tendons and the bones of my knees are gonna pop out.'" (Doc. 18 at Ex. 2). Believing Plaintiff to be presenting signs of *Methicillin-resistant Staphylococcus* ("MRSA"), Dr. Mosher admitted Plaintiff to the medical ward and prescribed Tylenol for pain, as well as the antibiotics Rifampin and Bactrim.[3] The following

---

[2] In addition to Dr. Ringle and Dr. Mosher, Plaintiff's Complaint named four other MCI workers employed by the ODRC. On June 21, 2010 this Court dismissed all claims against those four Defendants pursuant to 28 U.S.C. § 1915A. (Doc. 7).

[3] Plaintiff's Complaint refers to Bactrim as Co-Trimoxazole. The two drugs are one in the same, with Bactrim representing a brand name for Co-Trimoxazole. National Institutes of Health, Medline Plus, Co-trimoxazole Oral, http://www.nlm.nih.gov/medlineplus/druginfo/

2

day, February 1, 2008, Plaintiff was evaluated in the MCI medical ward by Dr. Ringle, who diagnosed Plaintiff's condition as *Erythema Nodosum*. Defendants characterize *Erythema Nodosum* as an "uncomfortable but non-dangerous and non-serious skin rash," the symptoms of which "typically disappear within about 6 weeks, but may recur." (Doc. 18 at 4). Because there is no known cure for *Erythema Nodosum*, Defendants state that "the standard protocol" is to "treat the possibility of underlying infections with antibiotics, maintain the patient on bed rest, and administer the anti-inflammatory, Motrin . . . ." (*Id*. at 3-4). Accordingly, Dr. Ringle prescribed Motrin and changed Plaintiff's antibiotic to Biaxin.

On February 5, 2008, Plaintiff complained of increased pain and swelling "to the point where walking to the cafeteria was almost impossible," a hindrance which Plaintiff claims caused him to begin skipping meals. The same day, Plaintiff was transferred to the Ohio State University Medical Center ("OSU"). There, doctors diagnosed Plaintiff with *Erythema Nodosum* and *Arthralgias* (a condition of sever joint pain). OSU doctors also took a biopsy of Plaintiff's skin lesion, discontinued Dr. Mosher and Dr. Ringle's prescriptions, and prescribed Naprosyn (an anti-inflammatory) and Nexium (an anti-ulcer agent). On February 7 Plaintiff was discharged from OSU with his condition listed as "Improved."

Upon Plaintiff's February 7 discharge, Plaintiff was admitted to the Corrections Medical Center ("CMC") until February 11, 2008. When Plaintiff was discharged from the CMC, the last nursing note stated "[patient] denies any discomfort at this time. [Patient] scheduled for discharge this AM." Plaintiff was then returned to his home institution at MCI where he was continued on Naprosyn, Prilosec (an anti-ulcer agent) and Tylenol. Additionally, Benadryl was prescribed for

---

meds/a684026.html (last visited Aug. 24, 2003).

3

itching, a wheelchair and cane were issued to aid mobility, and a dermatology consult was ordered by Dr. Ringle.

On February 20, 2008, Plaintiff returned to the CMC for the dermatology consult. There, an OSU dermatologist recommended compression stockings, Triamcinolone (a steroidal topical ointment), and SSKI (an expectorant used to thin mucous secretions). (Doc. 18 at Ex. 11). It should be noted that SSKI is "a non-formulary drug and is not kept in stock by the ODRC. All non-formulary medications require a request from the respective Medical Director directly to ODRC Central Office" before they can be obtained and administered. (Doc. 18 at 5-6).

When Plaintiff returned to MCI after the consult, the dermatologist's recommendations were transcribed into Plaintiff's MCI medical chart the same day, February 20. The transcribed order was not signed, however, for seven days. (*See* Doc. 18 at Ex. 12).

Each day on February 22, 23, and 24, Plaintiff asked the MCI nursing staff about the dermatologist-recommended treatments, and Plaintiff alleges that each day the staff denied any knowledge of them. When he asked again on February 25, Plaintiff alleges that two nurses "went looking for [P]laintiff's chart and found it [unsigned] under some paperwork on Dr. Ringle's desk." (Doc. 1 at ¶ 27). Plaintiff further alleges that two days later, on February 27, a nurse told Plaintiff that "the chart was given to Dr. Mosher and that 'it was being taken care of.'" (*Id*. at ¶ 29). Consequently, seven days after the dermatologist's order was transcribed, it was finally signed by Dr. Mosher on February 27. (*See* Doc. 18 at Ex. 12).

On February 29, 2008, Plaintiff received the first dermatologist-recommended treatment: Triamcinolone. Plaintiff continued to wait for the compression stockings and SSKI.

4

On March 3, 2008, Plaintiff alleges that MCI's Deputy Warden of Special Services told Plaintiff that Dr. Ringle denied the SSKI. Plaintiff's chart reflects that Dr. Ringle signed an order on March 3 that simply reads "D/C SSKI." (Doc. 18 at Ex. 12).

On March 4, 2008, Plaintiff alleges that his mother telephoned the ODRC Northern Regional Director's office to complain that Plaintiff had not received his medication.[4] The next day, March 5, 2008, Dr. Ringle sought and received approval from ODRC Central Office to purchase SSKI. (Doc. 18 at 6). Also on March 5, Dr. Ringle examined Plaintiff and signed an order prescribing SSKI, and recommending a rheumatology consult. (Doc. 18 at Ex. 12).

On March 10, 2008 Plaintiff received the dermatologist recommended compression stockings. Plaintiff continued to wait for the SSKI.

On March 13, 2008, Plaintiff alleges his mother again telephoned the ODRC Northern Regional Director's office to complain that Plaintiff had not received the SSKI. Plaintiff further alleges that on March 17, the ODRC Northern Regional Director notified Plaintiff's mother via email that Plaintiff would receive the SSKI. Plaintiff was given the SSKI on March 17, 2008 and reported feeling better immediately.

In all, Plaintiff received the Triamcinolone nine days after the dermatologist's recommendation, the compression stockings nineteen days after, and the SSKI twenty-six days after the February 20 recommendation.

Plaintiff subsequently filed this action on January 25, 2010 pursuant to 42 U.S.C. § 1983, alleging that the medical care provided by Defendants violated the Eighth Amendment's

---

[4] Plaintiff's Complaint alleges that Plaintiff's mother made numerous phone calls on his behalf to the MCI Assistant Health Care Administrator, the MCI Warden, and the ODRC Northern Regional Director. (Doc. 1 at ¶¶ 28, 33, 38, 43).

5

prohibition against cruel and unusual punishment, and the Fourteenth Amendment's due process clause.[5]

## II. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

---

[5] Between March 3, 2008 and March 30, 2008, Plaintiff filed four separate administrative grievance proceedings at MCI. (Doc. 1 at pp. 16-43). Plaintiff appealed all four grievances to the MCI Chief Inspector, and all four grievances were denied.

Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**III. Discussion**

      Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subject, or causes to be subjected, any

7

> citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress . . . .

42 U.S. § 1983. Plaintiff's section 1983 action charges that the medical care provided by Defendants violates both the Eighth Amendment's prohibition against cruel and unusual punishment, and the Fourteenth Amendment's due process clause. "Since the Fourteenth Amendment provides a prisoner with no greater protection than the Eighth Amendment," *Parrish v. Johnson*, 800 F.2d 600, 604 n.5 (6th Cir. 1986) (citing *Whitley v. Albers*, 475 U.S. 312 (1986)), this Court analyzes all of Plaintiff's claims under Eighth Amendment standards.

The Eighth Amendment's prohibition of cruel and unusual punishment "proscribes more than physically barbarous punishments." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). Instead, the Amendment forbids all punishments "which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society . . . .'" *Id*. at 102-03 (citing *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)). Such principles "establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Id*. at 103. In *Estelle*, the Supreme Court articulated when the standard of an inmate's medical care fails that obligation and runs afoul of the Eighth Amendment:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

429 U.S. at 104-05.

8

The prohibition of deliberate indifference to serious medical needs does not mean that "a complaint that a physician has been negligent in diagnosing or treating a medical condition [states] a valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 106; *accord Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (noting deliberate indifference under *Estelle* "describes a state of mind more blameworthy than negligence."); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("[F]ederal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner . . . . [A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106.

Establishing deliberate indifference requires proof of an objective component and a subjective component. *Comstock v. McCray*, 273 F.3d 693, 702 (6th Cir. 2001). "The objective component requires the existence of a 'sufficiently serious' medical need." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). "As explained by the Supreme Court in *Farmer*, 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). "To satisfy the subjective component, an inmate must show that prison officials had 'a sufficiently culpable state of mind.'" *Id.* (citing *Farmer*, 511 U.S. at 834). This is accomplished by demonstrating that the officials were both "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and that they "[drew] the inference." *Farmer*, 511 U.S. at 837.

**A. Subjective Component**

9

Plaintiff first contends that Dr. Mosher and Dr. Ringle were deliberately indifferent to his serious medical needs by prescribing and allowing him to take the sulfa-based drug Bactrim. Plaintiff alleges that "taking [sulfa-based] drugs such as [Bactrim] with the medical condition *Erythema Nodosum* can greatly increase the severity of the symptoms and can cause an increase in pain and suffering." (Doc. 1 at ¶ 16).

When Dr. Mosher treated Plaintiff on January 31, 2008 for what she believed to be signs of MRSA, she did prescribe Bactrim. Moreover, when Dr. Ringle diagnosed Plaintiff with *Erythema Nodosum* and wrote new prescriptions on February 1, Plaintiff alleges Dr. Ringle instructed him to continue taking the Bactrim until his new prescriptions were ready. Plaintiff's allegations, however, fail to satisfy the subjective component.

Plaintiff has provided no evidence to support his allegation that sulfa-based drugs either cause or exacerbate *Erythema Nodosum*. Even if he had, the allegation that Dr. Mosher misdiagnosed Plaintiff or prescribed the wrong medication fails to state a claim for anything more than negligence. *See Jennings v. Al-Dabagh*, 2004 U.S. App. LEXIS 8688, *4, (6th Cir. Apr. 29, 2004) (citing *Estelle*, 429 U.S. at 106) ("[A]llegations of medical malpractice or negligent diagnosis and treatment fail to state an Eighth Amendment claim of cruel and unusual punishment."). Similarly, Plaintiff has provided no evidence that Dr. Ringle instructed Plaintiff to continue taking Bactrim after diagnosing him with *Erythema Nodosum*. Again, even if he had, Plaintiff must show that Dr. Ringle knew Bactrim exacerbates *Erythema Nodosum*–a notion unproven by Plaintiff–and that Dr. Ringle disregarded this knowledge and instructed Plaintiff to continue taking the drug anyway. *See Farmer*, 411 U.S. at 825 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm

10

exists, and he must also draw the inference."). Therefore, Plaintiff's allegations that Defendants were deliberately indifferent by prescribing and allowing him to take Bactrim fail the subjective component.

Plaintiff also contends Defendants were deliberately indifferent to his serious medical needs by delaying the three *Erythema Nodosum* treatments prescribed by the OSU dermatologist. Specifically, Plaintiff waited nine days for the Triamcinolone, nineteen days for the compression stockings, and twenty-six days for the SSKI. Conversely, Defendants assert that Plaintiff received "every conceivable medical treatment available," (Doc. 18 at 12), including:

> antibiotics for infections . . ., eight different consults with dermatology, rheumatology, medical and pulmonary consultations . . . . He was provided a wheelchair and a cane and ordered to keep his legs elevated. He was medicated with analgesics for pain and provided with topical ointments and compression panty-hose to aid in his comfort, while the *Erythema Nodosum* ran its course.

*Id.* at 11. Moreover, Defendants highlight that Plaintiff ultimately received all treatments prescribed by the OSU dermatologist, even if "it may not have happened as quickly as Plaintiff would have liked . . . ." (Doc. 18 at 12).

"In *Estelle*, the Supreme Court specifically indicated that interruption of a prescribed plan of treatment could constitute a constitutional violation." *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991) (citing *Estelle*, 429 U.S. at 105) ("[I]ntentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed,' constitutes deliberate indifference). In *Boretti*, prison officials allegedly refused to provide prescribed pain medicine and regular bandage changes to an inmate who was recovering from a gunshot wound to the leg. 930 F.2d at 1154. In *Hines v. Wilkinson*, prison officials and medical personnel ignored an inmate's daily inquiries for prescribed penicillin and pain medication while the inmate was in

11

segregation following a beating that knocked two of his teeth loose. 1994 U.S. App. LEXIS 21598, *2, *8 (6th Cir. Aug. 10, 1994). In both cases, the Sixth Circuit found the interference with prescribed medical treatment sufficient to overcome the defendants' motions for summary judgment. *Boretti*, 930 F.2d at 1155; *Hines*, 1994 U.S. App. LEXIS at *9.

Furthermore, in *Byrd v. Wilson*, the Sixth Circuit held that "denial and/or indifference . . . [that] existed for *only a short period of time* . . . still satisfies the standards articulated in *Estelle* and *Westlake*." 701 F.2d 592, 595 (6th Cir. 1983) (emphasis added). In *Byrd*, doctors at an outside hospital diagnosed an inmate with post-hepatitic cirrhosis of the liver and prescribed medication, and a low-sodium, high protein diet. When the inmate returned to the prison, he was unable to receive his diet and medication for two days. *Id*. at 594. The Sixth Circuit held that despite the brevity of delay, the inmate's inability to get the prescribed treatments met the standard for deliberate indifference. *Id*. at 595.

In the case at bar, Defendants contend that any delay in providing Plaintiff with the three dermatologist-recommended treatments was not a result of deliberate indifference. Defendants stress that the dermatologist's recommendations were transcribed by Dr. Mosher the same day they were ordered. (Doc. 18 at 5). Moreover, Defendants contend that any delay in obtaining the SSKI was because it is "a non-formulary drug and is not kept in stock by the ODRC," thereby requiring approval from ODRC Central Office, which Dr. Ringle sought and received on March 5. September 6, 2011 (*Id*. at 5-6). Defendants also repeatedly cite to Dr. Mosher's affidavit, which urges that "[i]n my opinion, to a reasonable degree of medical certainty, all medical orders for treatments and medications were timely processed and administered to the Plaintiff in accordance

12

with [ODRC] procedures." (*Id*. at Ex. 4, ¶ 16). Defendant's arguments are not sufficient to succeed on summary judgement.

First, while Defendants correctly point out that the dermatologist's recommendations were transcribed the same day on February 20, Defendants fail to explain why that order was not signed until February 27, (*see* Doc. 18 at Ex. 12, pp. 1-2), despite Plaintiff's daily inquiries. (Doc. 1 at ¶¶ 24-26). The record of Plaintiff's MCI administrative complaints reflects that Dr. Ringle was on vacation at the time in question, with Dr. Mosher covering Dr. Ringle's responsibilities. (Doc. 1. at p.23). Defendants do not address these facts.

Second, once the order was signed by Dr. Mosher on February 27, Defendants do not explain why Dr. Ringle waited until March 5 to seek and obtain approval for the SSKI. Moreover, Defendants do not address Plaintiff's allegation that Plaintiff was told by MCI's Deputy Warden of Special Services on March 3 that Dr. Ringle denied the SSKI, (Doc. 1 at ¶ 34), an allegation that coincides with a March 3 order signed by Dr. Ringle which simply reads, "D/C SSKI." (Doc. 18 at Ex. 12). This Court notes that the record of Plaintiff's MCI administrative complaints shows that MCI officials proffered the explanation that "Dr. Ringle was not familiar with the medicine that was recommended. He decided to research the medication. Once he determined that the medicine was appropriate it was ordered . . . . Dr. Ringle is our medical director he has final determination of your treatment not Dr. Mosher." (*Id*. at p. 30). Defendants' motion does not address this information or explain how it relates to the alleged March 3 denial, or the subsequent March 5 approval.

Third, once Dr. Ringle got approval for the SSKI, Defendants do not fully explain why it took from March 5 until March 17–another twelve days–for Plaintiff to receive the drug.

13

Defendants stress that SSKI is a drug not stocked by the ODRC, and is one requiring special approval to obtain. (*Id*. at 5-6). Moreover, this Court notes that the Sixth Circuit in *Byrd* stated that delay in treatment amounts to deliberate indifference only when "relief is readily available . . . ." 701 F.2d at 595. Despite this, facts remain disputed regarding the reason for the twelve day delay, and the point at which SSKI actually was, or could have been available. Defendants' reiteration of Dr. Mosher's opinion that "all medical orders for treatments and medications were timely processed and administered to the Plaintiff . . ." (Doc. 18 at 5-6), is not sufficient to settle that dispute.

Fourth, notwithstanding the delay related to the SSKI, Defendants do not address why Plaintiff did not receive the dermatologist-recommended Triamcinolone for nine days (two days after Dr. Mosher signed the order on February 27), or the compression stockings for nineteen days (twelve days after Dr. Mosher signed the order).

In considering the aforementioned factual issues, this Court is cognizant that the *Byrd*, *Hines*, and *Boretti* cases, *supra*, suggest that *intentional* or *deliberate* delay is required to prove deliberate indifference. As explained in *Hines*, however, "[d]eliberate indifference in this context does not require . . . a detailed inquiry into the officials' state of mind, but the officials' conduct or lack of conduct must demonstrate a knowing indifference to serious medical needs." 1994 U.S. App. LEXIS at *8-*9. In the instant case, the details of Defendants' "conduct or lack of conduct" as it relates to the delay of Plaintiff's treatment are facts which remain in dispute. Consequently, Defendants' motion for summary judgment cannot be granted as to the subjective component. *See Boretti*, 930 F.2d at 1155 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)) ("In a motion

14

for summary judgment, the burden is on the moving party to show that 'there is an absence of evidence to support the nonmoving party's case.'").

**B. Objective Component**

Defendants attempt to mitigate the delay in implementing the dermatologist-recommended treatments by maintaining that Plaintiff's *Erythema Nodosum* "was not a serious medical condition," (Doc. 18 at 12), and therefore cannot satisfy the Eighth Amendment's objective component. *See Blackmore*, 390 F.3d at 895 ("The objective component requires the existence of a 'sufficiently serious' medical need."). Defendants offer Dr. Mosher's affidavit, which states that *Erythema Nodosum* is "an uncomfortable but non-dangerous skin condition with symptoms that typically disappear in about six weeks, but may recur." (Doc. 18 at Ex. 4 ¶ 8). Defendants' motion also suggests the condition is not sufficiently serious because it typically lasts for a finite period with no lasting effects or "actual harm." (Doc. 18 at 6, 13).

In *Westlake v. Lucas*, the Sixth Circuit held that an inmate who is "exposed to *undue suffering* or the threat of tangible residual injury" states a proper cause of action under the Eighth Amendment. 537 F.2d at 860 (emphasis added). In *Boretti v. Wiscomb*, *supra*, prison officials failed to provide prescribed pain medicine and regular bandage changes to an inmate who was recovering from a gunshot wound to the leg. 930 F.2d at 1154 (6th Cir. 1991). Citing *Westlake*, the Sixth Circuit concluded that even though the inmate's wound never became infected, and despite the fact the wound properly healed with no lasting effects, the inmate's pain and mental anguish satisfied a claim under the Eighth Amendment. *Id*. at 1154-55 (citing *Westlake*, 537 F.2d at 860). In *Parrish v. Johnson*, one plaintiff who was a paraplegic was forced to sit in his own feces for several hours, and another who had a limited physical ability to clean himself was never

15

given adequate means to do so. 800 F.2d 600, 602-03 (6th Cir. 1986). Regardless of a lack of "lasting or severe" injury, *id*. at 603, the Sixth Circuit found such circumstances constituted the "unnecessary and wanton infliction of pain" prohibited under the Eighth Amendment. *Id*. at 605.

In this case, Plaintiff has offered evidence that he endured pain and suffering while waiting for the dermatologist-recommended treatments, notwithstanding the absence of a tangible residual injury. The record reflects that Plaintiff experienced severe pain and swelling, as well as difficulty walking to the point that he relied on a wheelchair and cane for mobility. Moreover, Plaintiff suffered this pain while waiting for treatments which Defendants' motion concedes were prescribed to "*provide comfort* and/or treat underlying symptoms while the *Erythema Nodosum* ran its course. (Doc. 18 at 6) (emphasis added).

This is not to say that every instance of suffering experienced with *Erythema Nodosum* is sufficiently serious to satisfy the objective component of the Eighth Amendment. As explained in *Westlake*:

> Whether a prisoner has suffered unduly by the failure to provide medical treatment is to be determined in view of the totality of the circumstances. In making this determination the trier of fact should consider the practicalities of the situation including the extent of the injury, the realistic possibilities of treatment, and the possible consequences to the prisoner of failing to provide immediate medical attention.

537 F.2d at 860 n.4. In light of the totality of the circumstances, including the pain suffered by Plaintiff, this Court finds there is a genuine issue of material fact as to whether Plaintiff's suffering is sufficiently serious to satisfy the objective component.[6]

---

[6] This Court notes that, inasmuch as the issue of suffering considers "the realistic possibilities of treatment," Defendants' argument that the dermatologist-recommended SSKI is not stocked by the ODRC and requires special approval is an appropriate part of the analysis. This point is only one of many circumstances relating to the objective component, however, and cannot dispose of the

16

Defendants further argue that Plaintiff does not satisfy the objective component because he fails to introduce evidence of causation, citing *Napier v. Madison County*'s requirement that "'an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay . . . .'" 238 F.3d 739, 742 (6th Cir. 2001) (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)).

Defendants mis-read *Napier* as establishing an essential element for satisfying the objective component. As explained by the Sixth Circuit in *Blackmore v. Kalamazoo County*, "the 'verifying medical evidence' requirement is relevant to those claims . . . where the prisoner's affliction is seemingly minor or non-obvious." 390 F.3d at 898. "*Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." *Id*. Specifically, in *Napier*, the denial of a dialysis treatment to an inmate who could receive a treatment after his release the same day, who had missed forty-one treatments already that year, and who told prison officials that missing a scheduled treatment was "no big deal," constituted the sort of non-obvious circumstance requiring verifying evidence as to the effect of the delay. 238 F.3d at 742-43. Conversely, in *Blackmore*, an inmate suffering from appendicitis "exhibited obvious manifestations of pain and injury. Blackmore complained of 'sharp' and 'severe' stomach pains for an extended period of time." 390 F.3d at 899. In erroneously dismissing the action, the district court

> noted that Blackmore's appendix did not burst, and that there was 'no evidence of any medical complications or consequences arising from the delay of

---

issue on its own.

17

> treatment . . . [or] that the delay contributed to the size or appearance of his surgical scar. There is simply no medical verification that his condition worsened as a result of the delay.'

*Id*. Despite this, the Sixth Circuit held that the obviousness of Blackmore's condition negated the need for verifying medical evidence. *Id*. The Court held "a jury could reasonably find that Blackmore had a serious need for medical care that was 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id*. (citing *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1987)).

Similarly, in this case there remains an issue of fact regarding whether the circumstances of Plaintiff's *Erythema Nodosum* were so obvious that "the delay alone in providing medical care create[d] a substantial risk of serious harm." *Id*. Consequently, Defendants' motion for summary judgement cannot be granted as to the objective component.

## IV. Conclusion

For there reasons stated herein, Defendants' motion for summary judgment is denied.

IT IS SO ORDERED.

    S/ *David A. Katz*
    DAVID A. KATZ
    U. S. DISTRICT JUDGE